******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

D'AURIA, J., with whom ELGO, J., joins, dissenting. It has been nearly two months since this court granted the motion filed by the foster parents, John N. and Diana N. (foster parents), to stay the trial court's January 27, 2025 proceeding, prohibiting the court from considering whether it should finalize the transfer of guardianship of the minor child, Jewelyette M., to her paternal aunt, given the unexpected and untimely passing of the respondent father, John M., on January 21, 2025. In doing so, the majority prevented the trial court from taking any further action in Jewelyette's best interest at a critical time in that child's life, following the death of her father, so that we could continue our deliberations in the foster parents' appeal and on the writ of error. At the same time, the majority denied the motions filed by the petitioner, the Commissioner of Children and Families (commissioner), to dismiss the appeal and writ of error as moot. I was in the minority on these orders. I believed at the time that this court issued these orders that the majority was indulging in the fallacy that intervening events had not mooted the principal issues arising in this case. I continue to believe that it was a mistake to grant the stay and to decline to dismiss what were and remain clearly moot cases. I therefore respectfully dissent.

The day after the respondent father passed away, on January 22, 2025, the foster parents moved to stay the trial court's November 4, 2024 order that granted the commissioner's motion to revoke the commitment of Jewelyette from the commissioner's custody and to prohibit the trial court from terminating the period of protective supervision that had been scheduled for review. On January 23, 2025, the trial court transferred guardianship of Jewelyette from the respondent father to her paternal aunt pending a full hearing, which had been set for January 27. On January 24, the commissioner moved to dismiss both the foster parents' appeal and

writ of error on the ground that the death of the respondent father rendered both moot. That same day, on January 24, this court sua sponte stayed the guardianship proceeding scheduled for January 27 until it issued orders responding to the commissioner's motions to dismiss. On February 6, by a four to three vote, this court granted a continuation of the stay it had issued on January 24, 2025, and denied the motions to dismiss.

Two months is hardly a heartbeat in the life of a case before this court. But it is an eternity to a nine year old child whose life has been full of tumult. I have full confidence in the pure motivations of my colleagues who determined that it was more important to grant the foster parents a stay and to see these appeals through than to allow the trial court to provide Jewelyette, the minor child at the center of this case, some semblance of stability. I simply think they were mistaken. Under the unusual and tragic circumstances presented, I am confident that the trial judge was able, and best suited, to manage a case that will continue to impact this child's life long after this decision is published, on an issue that is bound to repeat itself in other cases. A majority of this court chose to put the brakes on the trial court's ability to take further action, even considering those circumstances. Rather than forcing the parties, including Jewelyette, to wait for today's lesson in dueling statutory construction exercises—so detached from her life of friends, family and school—I would have let the trial court move forward with its consideration of the best course of action considering the death of the child's biological father and guardian.

The following additional procedural history of these appeals is foundational to my disagreement with the majority. Jewelyette was born in the summer of 2015 and has been in the care and custody of the commissioner since that time. The commissioner filed petitions to terminate the parental rights of Jewelyette's biologi-

cal parents, including the respondent father, in November, 2016. Her mother's parental rights were terminated in May, 2017, and Jewelyette began living with the foster parents in October, 2017. At that time, the foster parents might have believed that the respondent father's parental rights would be terminated and that they could proceed with legally adopting Jewelyette. But, in 2019, circumstances changed, and the commissioner withdrew the petition to terminate the respondent father's parental rights and ultimately supported his reunification with Jewelyette.[1] The trial court nevertheless held on March 15, 2021, that the commissioner had not proven that reunification was in Jewelyette's best interest, despite the respondent father's enthusiasm about reunifying with Jewelyette and that he had "made substantial progress . . . [had] undertaken many services, has been employed, has a place to live and has some family support." The foster parents successfully obtained an order enjoining the Department of Children and Families (department) from removing Jewelyette from their home on November 22, 2021, perhaps seeing the writing on the wall—that the respondent father, then rehabilitated, equipped, and eager to reunify with young Jewelyette, threatened the foster parents' prospects for adopting Jewelyette.

Nearly two years after the foster parents secured that injunction, on December 11, 2023, the trial court removed the foster parents as intervenors in the neglect proceeding the commissioner had filed based on the Appellate Court's ruling in *In re Ryan C.*, 220 Conn. App. 507, 299 A.3d 308, cert. denied, 348 Conn. 901, 300 A.3d 1166 (2023), which held that General Statutes § 46b-129 (p) does not authorize the intervention of

---

[1] The commissioner filed another petition to terminate the respondent father's parental rights in 2019, which she later characterized as "erroneous" at the hearing to amend Jewelyette's permanency plan to reflect reunification as the goal of that plan.

persons unrelated to a child or youth in neglect proceedings. Id., 525. The foster parents appealed from that removal to the Appellate Court, and this court transferred their appeal to itself pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Jewelyette continued to live with the foster parents for several months after they were removed as intervenors while the department worked toward its stated goal of reunifying her with the respondent father. On July 16, 2024, the trial court removed Jewelyette from the foster parents' care and placed her with her paternal aunt following the commissioner's ex parte motion for emergency relief, which stated that, "[s]ince November, 2021, because of the temporary injunction, the department has been unable to execute appropriate foster care and permanency planning for the child . . . [and] the child has suffered and deteriorated while in the foster home placement." One month later, on August 26, 2024, Jewelyette was placed with the respondent father to continue reunification efforts.

On November 4, 2024, while the foster parents' appeal was still pending before this court, the trial court held a hearing on the commissioner's motion to revoke the commitment of Jewelyette. Immediately prior to that hearing, the foster parents sought to exercise their right to be heard pursuant to § 46b-129 (p) and asked the trial court to refrain from ruling until after this court heard their appeal emanating from the trial court's December 11, 2023 ruling, maintaining that they were wrongfully removed as intervenors at that hearing. The trial court rejected this contention and, after granting the foster parents the ability to make a statement before the start of the hearing, proceeded to find that (1) cause for the commissioner's commitment of Jewelyette no longer existed, (2) revocation of that commitment was in Jewelyette's best interest, subject to a six month period of protective supervision, and (3) guardianship

should be transferred from the commissioner to the respondent father. The foster parents then filed a writ of error contesting the trial court's application of § 46b-129 (p), which we consolidated with their appeal for the purpose of hearing oral arguments on December 19, 2024.

No one, as far as we know from the record, expected at the time that oral arguments took place that an intervening event like the respondent father's death would occur, mooting this appeal and writ of error. But it did occur. When this court hears controversies that subsequently become moot, we should not stretch the bounds of our mootness doctrine to decide issues that only potentially could aggrieve a party. This is particularly true when the issue revolves around a child because of the increased likelihood of irreparable harm, and is even more true when the very same issue— whether *In re Ryan C.*, supra, 220 Conn. App. 507, should be overruled, permitting foster parents the right to intervene in abuse and neglect proceedings—is already scheduled to be determined in another pending appeal; see *In re Andrew C.*, 350 Conn. 932, 326 A.3d 1107 (2024); *In re Andrew C.*, 350 Conn. 931, 326 A.3d 1107 (2024); which will be heard before this court in just a few weeks.

There is no debate that the existence of an actual controversy is essential to appellate jurisdiction, both at the inception of the appeal and throughout its pendency. As we have stated so many times, we do not "decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow." (Internal quotation marks omitted.) *Ayala* v. *Smith*, 236 Conn. 89, 93, 671 A.2d 345 (1996). "When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Internal quota-

tion marks omitted.) *In re Allison G.*, 276 Conn. 146, 165, 883 A.2d 1226 (2005). When a case becomes moot because of intervening events, it can result in the court's resources and deliberations falling by the wayside. It is often tempting to finish what we started, rather than accepting that the court's collective efforts might have gone for naught. Our motivations in succumbing to that temptation may be nothing but honorable: we do not want to deprive the remaining parties, future parties, or the lower courts of our collective wisdom or direction on what is undoubtedly an important legal issue. It is an occupational hazard of dispute resolution, however, that our efforts might not always end up in the law books. See, e.g., *CT Freedom Alliance, LLC* v. *Dept. of Education*, 346 Conn. 1, 28–29, 287 A.3d 557 (2023) ("our charge is to resolve only live disputes, no matter how interesting the moot issues presented might be to us or to the parties before us, or how important the case might have been at an earlier time").

In my view, it is telling that, to save this court's continued appellate jurisdiction, the majority does not adopt the foster parents' argument that their right to intervene in neglect proceedings is capable of repetition yet evading review, the most tried and true exception to the mootness doctrine. This is likely because that exception is so clearly unavailable. Although the issue is certainly likely to arise again, it will not evade review— indeed, it has already come to the forefront of this court's attention considering the impending oral argument in *In re Andrew C.* Instead, determined to see through to conclusion our consideration of an issue that will not evade review in so many future appeals,[2]

---

[2] It is not apparent to me why we would hasten a decision in the present case when the argument in *In re Andrew C.* has already been set. In fact, that case was to be argued before the release of the decision in the present case, but this court marked argument over to the following term. By doing so, this court effectively prevents counsel for the parties in that case from making their arguments in an undoubtedly live controversy because the majority's decision in the present case almost certainly preempts those arguments.

the majority invents two reasons why the foster parents' appeal and writ of error are not moot in the first place. Neither work, in my view.

First, the majority contends that the January 23, 2025 order transferring guardianship from the deceased respondent father to the paternal aunt was merely "interim" and, "[f]or that reason alone, it did not moot any aspect of the matters sub judice in this court." What the majority omits from this discussion, however, is that the only reason the trial court did not conduct a full hearing and issue a final order is *because this court stayed any further proceedings that would have, without question, mooted the appeal and writ of error.* The majority finds support for its contention that a case facing imminent mootness remains justiciable not from the case law of this state, but from a secondary source that equivocates on the question, the full quotation providing that "a prediction that an action may become moot can weigh in the decision whether a preliminary injunction is appropriate. In a strategy so familiar as to go unremarked in most settings, a court may cooperate in avoiding decision by deferring to settlement negotiations that will moot the dispute. And a court that is confident that a mooting event is imminent may even seize the event as a justification for not deciding the case." (Footnotes omitted.) 13B C. Wright et al., Federal Practice and Procedure (3d Ed. 2008) § 3533.1, pp. 742–43. To the extent that the mootness doctrine has prudential elements, even if I were to agree that we have discretion to issue orders to protect against a case becoming moot, I have little trouble concluding that the majority has abused that discretion in this case by issuing a stay.

Moreover, the majority has manufactured the notion that the "interim" order in the present case did not moot the appeal and the writ of error by putting far too much weight on the timing of a particular proceed-

ing while minimizing the substance of the extraneous events that precipitated that proceeding. Whether an initial ruling is superseded, and therefore moot, concerns the effect of the extraneous events that nullify the first ruling, not the timing of the subsequent ruling, interim or otherwise. See, e.g., *State* v. *Santiago*, 219 Conn. App. 44, 56, 293 A.3d 977 (challenge to criminal sentence was superseded because it had already been modified), cert. denied, 346 Conn. 1028, 295 A.3d 944 (2023). In *J. Y.* v. *M. R.*, 215 Conn. App. 648, 654–56, 283 A.3d 520 (2022), the single case from this state that the majority references in comparison to the secondary sources it relies on to support its contention that an imminently moot case remains justiciable, the Appellate Court held that it could not provide relief based on an interim custody order. The temporary nature of the "interim" order was not the reason why the defendant in *J. Y.* could not obtain relief, however. See id., 661. Rather, it was because any relief the court could have afforded the defendant became untenable once the final order captured the entirety of the first order; the proper redress would therefore be to "challenge the propriety of the final orders." Id., 662. Conversely, if there had been no final order in *J. Y.*, the Appellate Court ostensibly *could* have granted relief based on the interim order. See id. ("the interim orders became inoperative *following the issuance of the final orders*" (emphasis added)). In the present case, the fact that the January 23, 2025 order contemplated a final hearing does not mean that it did not supersede the prior order transferring guardianship to the now deceased respondent father. The majority's hyperfocus on the temporal nature of the hearing distracts from what should be the central question—whether the extraneous event that demanded the hearing—the respondent father's death—mooted the substance of the November 4, 2024 judgment. The majority attempts to answer this question in its second

argument for why this appeal is not moot, asserting that the January 23, 2025 hearing "does not alter the availability of the relief sought by the foster parents here." I disagree. An outline of the foster parents' requested relief in their appeal and writ of error reveals why, in my view, these matters are moot. See footnote 11 of the majority opinion ("[t]he relief sought . . . is [the] reversal of the November 4 order revoking commitment, restoration of their rights as intervenors, and a new revocation hearing").

The foster parents, in their appeal, ask that this court "reverse the trial court's December 11, 2023 order, which granted the [commissioner's] motion to remove the intervening foster parents as parties to the neglect petition matter . . . ." The problem, of course, with providing the foster parents the renewed right to intervene in the neglect proceeding is that, with the respondent father's death, the landscape for that neglect proceeding is markedly different. By granting the foster parents this relief, this court is providing them the opportunity to intervene in a proceeding that is, if not hollow, then at the very least, irreparably changed from the case in which the foster parents initially sought to intervene. The only reason that the neglect proceeding continued beyond November 4, 2024, was to ensure that the respondent father had the access to parenting resources that the department was to provide.[3] Permit-

[3] The record reveals that the only reason the commissioner continued to maintain protective supervision over Jewelyette was for the respondent father, then alive, to have easier access to parenting programs and other resources. During that November 4, 2024 hearing, Jewelyette's guardian ad litem stated: "I agree with the testimony that [the respondent father has] provided a loving, supportive family for [Jewelyette] . . . and I don't see any concerns from a safety point of view. . . . I do think that he needs services and . . . [i]f there is protective supervision, those services will continue. There was testimony that he reach[ed] out to [the department for resources]. . . . He's been referred to the fatherhood engagement services. . . . I believe if there's no protective supervision, he would not be able to get access to that service. . . . He right now has [the intensive family preservation program], which is a [department] service, which he's in the middle of receiving help with. I think that needs to continue for a period of

ting the foster parents to intervene in this sort of proceeding is precisely the type of impractical relief that our mootness doctrine prohibits.

With respect to the writ of error, the foster parents asked this court to reverse the trial court's November 4, 2024 order "granting [the commissioner's] motion to revoke commitment, restoring custody and guardianship of the minor child to the respondent father, and ordering a period of protective supervision." The problem is, again, that that relief is also no longer available: the trial court's determinations in the November 4, 2024 proceeding required the respondent father to be a party because each was premised on the fact that that *the father was a fit guardian for Jewelyette*. Because he is now deceased, that premise no longer applies, and the determinations from that proceeding are nullified. Even if this court disregards that the basis of the neglect proceeding is no longer viable, reinstatement of the commissioner's commitment of Jewelyette based on the writ of error would mean little to the foster parents if they were not also granted the right to intervene based on their separate appeal, considering that their claimed right to intervene derives from a separate request for relief, and that the department, the child's attorney, and the guardian ad litem support revoking commitment.[4]

time, and [the Intensive In-Home Child and Adolescent Psychiatric Services (ICAPS) program, which provides parenting and therapeutic support services], you know. I know from my experience with ICAPS, there's like 500 people on the wait-list. . . . I do sometimes think that [individuals with an open department matter] get priority access . . . ." In fact, the commissioner's counsel noted that "the period of protective supervision has nothing to do with [the] foster parents. It has to do solely with the family that we have here and addressing any child protection concerns. *That would be the only reason that the department would stay open and monitor the family.*" (Emphasis added.)

[4] Even if I were to assume that the relief the foster parents seek is not moot, the fact that the commissioner, the child's attorney, the child's guardian ad litem, and the child's therapist all oppose the foster parents' intervention puts into question the foster parents' likelihood of success on the merits. It is black letter law that granting a stay requires a court to engage in an

The majority suggests that the only difference between the status of this case presently and before the respondent father's death is that "reversal of the order prior to [the respondent father's] death would have meant that custody of Jewelyette reverted back to the commissioner from [the respondent father], whereas, now, custody would revert back to the commissioner from the aunt." Footnote 11 of the majority opinion. This is no small difference. I view this explanation as a logical leap by the majority to keep alive a controversy that no longer exists, or that at least has been transformed into a different controversy. The majority concedes that the issue has been irreparably changed but maintains that this court can still afford the foster parents practical relief because Jewelyette's best interest remains "front and center" after the death of her father. I agree wholeheartedly that Jewelyette's best interest remains at the forefront of the trial court's consideration—that is why I believe it was a mistake to grant the foster parents' motion to stay, given that doing so only delayed that consideration. What I disagree with, however, is that the case in which the foster parents initially intervened remains the proper vehicle for them to litigate their claim. As the majority states, the issue before the trial court at the time of the foster parents' intervention was whether it was in Jewelyette's best interest to remain with the foster parents or to take another step toward reunifying her with the respondent

equitable balancing test, which at least in part considers the "likely outcome of the appeal" and "the irreparability of the prospective harm . . . ." *Griffin Hospital* v. *Commission on Hospitals & Health Care*, 196 Conn. 451, 458, 493 A.2d 229 (1985). The majority does not attempt to justify the stay this court issued following the death of the respondent father, which is now approaching two months, much less specifically address the foster parents' likelihood of success on the merits, considering the change in events and the amount of time that has passed. In my view, the stay should have been denied, principally because the relief sought by the foster parents was no longer viable, but also because the foster parents were unlikely to succeed on the merits of their claims.

father. *Half of that equation is no longer there.* Although, against this new factual landscape, it is possible that the majority's decision might benefit the foster parents, that is often true of advisory opinions. They help the parties and the trial court. But the majority's insistence that the foster parents will practically benefit from this advice presumes that the trial court at the January 27, 2025 hearing would not have provided the foster parents with the most expansive version of the right to be heard in light of the new factual landscape. Simply put, the relief that the majority characterizes as practical is, in my opinion, pure conjecture. As was the case in *J. Y.*, the foster parents may properly challenge the trial court's January 23, 2025 order, but they may not turn back time to when the respondent father was alive and the beneficiary of the commissioner's revocation of commitment.

There is no doubt in my mind that the majority believes that the foster parents got a raw deal in this case. "Hard cases make bad law," goes the old legal maxim. But from our lofty perch, appellate courts also make bad law when we detach ourselves from the realities that trial judges, juvenile court lawyers, social workers, biological parents, relatives, and, yes, foster parents, face each day in the trenches of our state's complex, integral, and at times fallible child welfare system. The foster parents—who unquestionably have been doing important, necessary, and painstaking work— undoubtedly saw the respondent father as an unwanted interloper and sought to intervene to vindicate their own "right to family integrity" as preadoptive foster parents.

What the majority neglects to consider is that, sometimes, the position of the department can be driven by changed circumstances. Sometimes, as was the case with the respondent father, a parent can turn his or her life around in time to play a responsible parental role

in the child's life. State policy encourages and rejoices in that type of uncommon change. Moreover, the department's position must be informed, with input from counsel, by the art of the possible. As Judge Elgo properly points out in her dissenting opinion, terminating the parental rights of the respondent father (or any parent for that matter) by clear and convincing evidence is no easy feat. And it shouldn't be. It would be objectively reasonable for the commissioner's counsel to advise, as we can infer occurred in this case, that continuing to press to terminate the respondent father's parental rights so that Jewelyette could remain with her foster parents could be ill-fated. Finally, what also is subject to change is that a parent can suddenly become unavailable, due to death, illness, or other circumstances. This type of change results in an entirely different factual and legal landscape, requiring a trial court to quickly pivot in the interests of what is now not just a neglected child, but a grieving one.

We will never know if the trial court proceeding that was scheduled for January 27, 2025, would have inflicted the type of irreparable harm to the foster parents that the majority apparently believed it would have based on its issuance of a stay. Nor will we ever know if the trial court might have provided the foster parents with all the process they could have hoped to receive at that hearing,[5] given the changed factual landscape and the development of the legal issues raised in the foster parents' appeal and writ of error before this court.

[5] If the reason for the majority's insistence in delivering this opinion before any further hearing took place in the trial court was so that it could provide instruction on what the "right to be heard" means under § 46b-129 (p), I would say it was not worth the wait. After this buildup, the majority defines "the right to be heard" as "the right to be present throughout the proceeding in question and to argue at the appropriate time as to the child's best interest in light of the evidence presented relating to that issue," which the majority quickly equivocates is "not absolute" because a trial court, of course, has discretion to modify that procedure for good cause.

The majority defends the court's granting of the foster parents' motion to stay because the "wait and see approach" might result in further delays for the foster parents in advancing their interests. Perhaps. Or, perhaps a resolution would have been reached, and perhaps there would have been no further need for appellate proceedings. In any case, given all that has occurred in the meantime, there is no reason to credit the majority's expectation that the foster parents' exclusion from the November 4, 2024 hearing would have necessarily repeated itself if the trial court had been permitted to hold the January 27, 2025 hearing after the respondent father's death.

If this court had any expectation that the stay issued in this case would result only in a brief delay, that expectation was unrealistic. This court should have denied the foster parents' motion to stay further proceedings because the respondent father's death mooted the legal landscape that informed the November 4, 2024 judgment. The foster parents' requested relief in their appeal and writ of error is neither practical nor tangible. Because I believe this court should have denied the foster parents' motion to stay, permitted the trial court to move forward in the case, and declared the issues on appeal and in the writ of error moot, I respectfully dissent.